## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI NEWS TRUST, INC.,

     *Plaintiff,*

vs.

CITY OF MIAMI, and

JAMES REYES, City Manager,
     *in his official capacity,*

     *Defendants.*

Case No. _____

### VERIFIED COMPLAINT

Miami News Trust, Inc. ("Plaintiff"), as publisher of the Coconut Grove Spotlight, sues the City of Miami ("the City") and the Miami City Manager, Mr. James Reyes, ("the City Manager" and, collectively with the City, "Defendants") and alleges the following:

### NATURE OF ACTION

1. The First Amendment prohibits "abridging the freedom of speech, or of the press." U.S. Const. Amend. I.

2. Inherent in the First Amendment's guarantees is the "right to receive information," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (citation modified), which extends to both the press and the public, and without which the Free Press Clause would be eviscerated.

1

3.      But in Miami, the City bars its employees from speaking with the press at any time—regardless of topic or sentiment—unless they first notify the Office of Communications and, second, receive permission from the City Manager to speak. Miami, Fla., Administrative Policies § 01-11 (Revised Mar. 2018) at 1 ("Gag Order," attached as Exhibit A).

4.      This sweeping restriction is unconstitutional. It extends beyond speech made pursuant to official duties and captures casual conversations, personal opinions, and comments on matters of public concern. *See Harman v. City of New York*, 140 F.3d 111, 115 (2d Cir. 1988) (holding that a gag order is an unconstitutional prior restraint).

5.      On information and belief, some of the City's employees have refrained from speaking with Miami News Trust's journalists because of fear of disciplinary action under the Gag Order.

6.      The Gag Order also makes it practically impossible for Miami News Trust's reporters to obtain timely comments on newsworthy events as they develop. For example, the Gag Order prevents Miami News Trust from obtaining information from employees in real-time in response to a question because it mandates a series of speech pre-screenings and prior permission to speak.

7.      To protect freedom of the press and freedom of speech for the City's employees, Plaintiff challenges the constitutionality of the Gag Order under the First Amendment.

2

## JURISDICTION AND VENUE

8.      This action is brought under 42 U.S.C. § 1983 to enforce the Plaintiff's rights under the Constitution of the United States. This Court has subject matter jurisdiction over all claims as federal, constitutional questions, pursuant to 28 U.S.C. § 1331 and § 1343(a)(3).

9.      Because Defendants exist and reside in the Southern District of Florida, venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and § 1391(b)(2). This Court has authority to grant declaratory relief pursuant to 28 U.S.C. § 2201(a) and § 2202, and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## PARTIES

10.      Plaintiff Miami News Trust, Inc., is a nonprofit Florida corporation dedicated to providing reliable, timely, and informative news that fosters civic engagement and promotes transparency, accountability, and inclusivity through community journalism.

11.      Miami News Trust, Inc., is the publisher of the Coconut Grove Spotlight ("the Spotlight"), an independent publication that primarily covers Coconut Grove, a Miami-Dade community of about 20,000 people, where Miami City Hall is located.

12.      Defendant City of Miami is a municipality in Miami–Dade County, organized and existing under the laws of the State of Florida and subject to

3

requirements of the First Amendment through incorporation by the Fourteenth Amendment.

13.     The City of Miami employs over 4,000 employees, who are subject to its policies. *Human Resources*, City of Miami, https://www.miami.gov/My-Government/Departments/Human-Resources.

14.     Defendant James Reyes is City Manager for the City of Miami. In that role, Mr. Reyes serves as the City's Chief Administrative Officer, and enforces the City's laws and ordinances, appoints and removes department directors and subordinate employees, and recommends measures to the mayor and city commission that he deems "necessary or expedient." Miami, Fla., Charter § 16 (Apr. 21, 2026). He is sued in his official capacity.

**FACTUAL ALLEGATIONS**

**The Spotlight's Operations**

15.     Since its founding in 2020, the Spotlight has published factual, reliable, and community-focused journalism intended to inform residents, connect citizens, and reflect the community's diverse character.

16.     Through its reporting on Miami news and civic affairs, the Spotlight seeks to inform the public, increase government accountability, and strengthen local democracy.

17.     To report on City government, the Spotlight relies on receiving timely and accurate information from City employees who are knowledgeable about the subject matter and work within the relevant department.

4

18.     To obtain that information, the Spotlight's reporters often need to communicate directly with the City's employees.

19.     Direct communication with the City's employees allows the Spotlight to: (i) obtain information from its sources quickly, without delay from intermediaries; (ii) receive immediate responses from knowledgeable sources directly, without censorship by higher-ups; and (iii) develop a personal relationship with the source that facilitates future reporting on important matters within the City.

**The Gag Order**

20.     The City's Gag Order unconstitutionally prevents this free exchange of timely and accurate information.

21.     The Gag Order was originally issued in 2011, in response to a political feud between the City's then-sitting Mayor and Police Chief. *See* Patricia Mazzei & Charles Rabin, *Manager Cuts Back Media's Access*, The Miami Herald, Jan. 13, 2011.

22.     The Gag Order was revised in July 2011 and March 2018. § 01-11 at 3.

23.     The operative Gag Order was signed into effect by then-sitting City Manager, Emilio Gonzalez, on March 22, 2018. *Id.*

24.     The Gag Order states that its policy is "to respond to news media questions or inquiries effectively, accurately and quickly to inform its residents, businesses, and visitors." *Id.* at 1.

25.     The Gag Order regulates "*all* interaction with the media and response[s] to media requests for information." *Id.* (emphasis added).

26.     The Gag Order further defines its scope as employees' "communication with or information provided to all media in any form." *Id.*

27.     The Gag Order states that, except for "incidents involving police, fire or public safety emergency services[,] [t]he Office of Communications will serve as the sole liaison with the media, either by responding to requests for information or facilitating contact with the appropriate department." *Id.*

28.     The Gag Order further provides that "Media contact shall be initiated *only* by the Office of Communications. This includes contacting reporters and editors." *Id.* at 2 (emphasis added).

29.     The Gag Order additionally mandates that "City employees or Departments shall not initiate news media contacts or arrange news conferences and the like without prior approval." *Id.*

30.     The Gag Order also requires that "*all* City employees must notify the Office of Communications and the employee's Department Director about *all* television, radio, newspaper or other media inquiries they receive and provide the Office of Communications with the reporter's name, phone number, subject of the inquiry, deadline, and other relevant information," except for issues relating to "public safety issues involving police, fire or emergency services" (the "Emergency Services Exception"). *Id.* at 1 (emphasis added).

31.     The Gag Order acknowledges that "employees have the right to their personal points of view," but notes that employees' "personal points of view may conflict with the City's official policy." *Id.* at 2.

32.     Furthermore, the Gag Order requires "an employee choos[ing] to identify himself or herself as a City employee in any personal letter or email to the editor or any other media" or "address[ing] a public meeting, participat[ing] in a radio talk show, or [interviewing] for a radio or television program" to include an express disclaimer that any statements "are the employee's personally held opinions." *Id.* (emphasis added).

33.     But even if a City employee makes the disclosures required by the City when expressing "personal points of view," the Gag Order facially prohibits employees from responding to media-initiated inquiries, stating that "where the media inquiries involve talk shows, radio, television, or web appearances[,] *all* responses shall receive advance approval from the City Manager," aside from the Emergency Services Exception. *Id.* at 1 (emphasis added).

34.     And even when an employee makes the City's mandated disclosures relating to an employee's "personal point[] of view," the Gag Order facially prohibits employees from proactively contacting journalists, stating that "[m]edia contact shall be initiated only by the Office of Communications," and providing that "City employees . . . shall not initiate news media contacts or . . . the like without prior approval from the City Manager and in consultation from the Office of Communication[s]." *Id.* at 2.

**The Gag Order's Effects on the Spotlight's Newsgathering**

35.     Because of the Gag Order, the Spotlight has struggled to obtain information directly from City employees who are willing to speak with the Spotlight.

36.      For example, on December 30, 2025, the Spotlight was reporting on ongoing construction-noise issues and contacted City employees to obtain information regarding construction noise waivers and enforcement procedures. Exhibit B.

37.     A City employee responded directly to the Spotlight's editor, David Villano, and provided information regarding the status of noise waivers and the City's handling of the issue. *Id.*

38.     The Spotlight's editor replied and asked the City's employees whether there is "a website or publicly accessible database that would allow city residents to check the existence and status of construction noise waivers?" *Id.*

39.     At 11:19 a.m., a City employee confirmed that no such database existed and that the Spotlight may "continue to reach out to [her] as needed." *Id.*

40.     At 11:21 a.m., the Spotlight's editor responded, asking whether any active construction noise waivers were currently in effect in Coconut Grove. *Id.*

41.     At 11:25 a.m., the City employee retracted the email and copied the Office of Communications on the recall message. *See* Exhibit C.

42.     At 11:35 a.m., a City employee from the Office of Communications replied to the Spotlight editor, saying "Ms. Prada inadvertently replied directly to

[Mr. Villano] instead of furnishing the information to [the Office of Communications]." Exh. B.

43.     The Office of Communications further requested that the Spotlight "refrain from contacting employees directly" because the Office of Communications "is tasked with serving as the point of contact for all media inquiries." *Id.*

44.     The Spotlight's editor responded that the City's Gag Order governs City employees, not members of the press, and stated that routing all media inquiries through a single office limits timely access to information. *Id.*

45.     The Spotlight's editor also noted that the City employee had initially provided real-time information regarding the issue but stopped communicating immediately after being instructed to route all media inquiries through the Office of Communications. *Id.*

46.     Since then, the Spotlight's request for additional information regarding active construction noise waivers remains unanswered. *Id.*

47.     In the five months since the Office of Communications intercepted the Spotlight's communication with the willing speaker (Ms. Prada) and instructed that all communications be routed through the Office of Communications, the same City employee has stopped providing the Spotlight with information.

48.     For example, on January 30, 2026, the Spotlight contacted that same City employee, Ms. Prada, who had been a willing speaker, seeking information about newly announced construction noise waiver policies that were being circulated publicly by a city commissioner's office. *See* Exhibit D.

49.     The Spotlight asked the City employee a series of questions regarding the existence, implementation, and status of the new policies. *Id.*

50.     Rather than responding to the Spotlight's questions, the City employee told the Spotlight's editor to file a public records request to obtain the information. *Id.*

51.     The Spotlight's editor responded that several of the questions did not seek public records but instead sought clarification regarding current City policies. He also questioned why the Spotlight was being directed to a more burdensome process to obtain routine policy information already circulating publicly through a city commissioner's office to Miami residents. *Id.*

52.     The City employee responded by saying that she was following the "appropriate protocol" and attached the City's Gag Order. *Id.*

53.     The Spotlight's editor stated that the Spotlight would file a public records request for the relevant documents and asked the City employee the same set of questions "which seek clarification and do not require the release of any public records." *Id.*

54.     The following day, another City official informed the Spotlight that the City requires "one point of contact for all media inquiries" and instructed the Spotlight to follow that protocol (i.e., the Gag Order) "moving forward." *Id.*

55.     When the Spotlight asked whether members of the media were required to request information through the Office of Communications rather than

10

communicating directly with City employees, the City official responded: "Yes, sir. That is the policy." *Id.*

56.     On other occasions, the City redirected the Spotlight's inquiries to various employees, preventing the Spotlight from receiving information from the individuals with whom it had already established a relationship. *See* Exhibit E.

57.     For example, in February 2026, the Spotlight sought an interview with Quatisha Oguntoyinbo-Rashad regarding the City's tree-protection framework. *Id.*

58.     Due to Ms. Oguntoyinbo-Rashad's extensive knowledge and experience, the Spotlight believed she could provide a unique perspective that no other City employee would be able to provide. *Id.*

59.     When the Spotlight asked to contact Ms. Oguntoyinbo-Rashad directly, the City told the Spotlight to wait for a response from the Office of Communications. *Id.*

60.     More than two weeks after the initial request to interview Ms. Oguntoyinbo-Rashad, the City responded declining the Spotlight's interview request. *Id.*

61.     Having been unable to receive the desired information, the Spotlight's editor, Mr. Villano, submitted a second request to interview Ms. Oguntoyinbo-Rashad, this time with different questions, on April 24, 2026. *See* Exhibit F.

62.     Because he had not received a response 10 days later, Mr. Villano followed up regarding this request on May 4. *Id.*

63.     This time, an employee in the City's Office of Communications, Helena Poleo, once again denied the request to speak with Ms. Oguntoyinbo-Rashad, saying, "I believe you already were able to speak to someone in the Building Department for your story. Ms. Oguntoyinbo-Rashad is not available for interviews." *Id.*

64.     The Spotlight's editor, Mr. Villano, advised the City that this action may not comply with the Gag Order's stated procedures and may additionally violate state and federal law. Mr. Villano copied both Ms. Oguntoyinbo-Rashad and the City's attorney, George Wysong, on the email for clarification *Id.*

65.     Ms. Poleo responded by sending a link to the Gag Order and threatening that "[i]f [the City and the Spotlight] are to continue to work together, [she] would appreciate if [the Spotlight would] follow the guidelines." *Id.*

66.     Mr. Villano sought clarification, asking, "Are you suggesting that a working relationship between Communications and the Spotlight is contingent on our staff complying with guidelines intended for city employees? Please clarify." *Id.*

67.     Before clarification was given, Stephanie Panoff, counsel from the Office of the City Attorney, replied to the email chain, copying Ms. Oguntoyinbo-Rashad, and asserting that "the policy does not restrict the media from asking City employees whether they wish to comment on a matter of public concern as a private citizen, though the decision to respond is solely up to the employee." *Id.*

12

68. Ms. Panoff's response conflicts with the City's previous emails to the Spotlight stating that, pursuant to the Gag Order, the Office of Communications decides whether an employee may respond to a media inquiry. *See* Exh. B.

69. At times, as a policy or custom, the City fails to adhere to its Gag Order and restricts (i) speech by its employees and (ii) the receipt of information by the press even more oppressively than the Gag Order's own terms dictate.

70. The Gag Order states that employees must "must notify the Office of Communications and the employee's Department Director about all television, radio, newspaper or other media inquiries they receive," and that the Office of Communications and City Manager "***will*** . . . coordinate a response including designating a spokesperson." Exh. A (emphasis added).

71. But in response to the Spotlight's media requests, the City has repeatedly failed to follow this protocol and has refused to designate a spokesperson to respond to inquiries. *See* Exhibit G.

72. For example, the City's Office of Communications declined the Spotlight's request to interview Ken Kalmis, the City employee most knowledgeable about the subject matter related to the Spotlight's ongoing reporting about the City's transfer of unused density credits. Exhibit H.

73. On that day, May 26, 2026, the Spotlight emailed the Office of Communications requesting an interview with Mr. Kalmis about the density-credit transfer issue the Spotlight was reporting on. *Id.*

74. The Spotlight sent a follow-up email to the Office of Communications the following morning, May 27, after receiving no response. *Id.*

75. On May 28, the City responded that Mr. Kalmis was unavailable for an interview. *Id.*

76. The Spotlight responded that the requested City employee was uniquely qualified to answer the questions because he had personally reviewed, approved, and signed documents previously referenced in the Spotlight's reporting. *Id.*

77. The Spotlight further asked which City official, pursuant to the Gag Order, would serve as a substitute to answer the questions if the requested employee, Mr. Kalmis, would not be made available. *Id.*

78. As of the time of filing this complaint, the City has still not responded to the Spotlight's inquiry regarding a substitute spokesperson for Mr. Kalmis.

79. The Spotlight will continue to gather and report the news in Coconut Grove and continue to seek information from City employees. The Gag Order significantly impairs those efforts by restraining City employees from speaking with the Spotlight's reporters.

80. The Gag Order also allows private citizens to receive information faster than the Spotlight and other members of the press.

81. For example, the Spotlight emailed the Office of Communications (specifically, Ms. Poleo) to receive a copy of a substitution ordinance that had yet to be published online. *See* Exhibit I.

82.     Ms. Poleo responded "[r]eceived," without providing any additional information or indicating when the substitution ordinance would be available. *Id.*

83.     On the same day, a private citizen (who is not a member of the media) contacted the City Clerk for a copy of the same substitution ordinance. *Id.*

84.     Within four hours, the private citizen received an email with a copy of the requested documentation, allowing him quicker and easier access to information than the press. *Id.*

**Chilling Protected Employee Speech**

85.     According to news reports, a City employee was fired based on the Gag Order for speaking to the press about questionable decisions made by City leadership without first receiving permission from the same individuals whose actions were questioned. *See* Raisa Habersham, *Little Haiti Cultural Complex Loses Another Director. That Makes Four in Six Years*, The Miami Herald, Feb. 23, 2026, https://www.miamiherald.com/news/local/community/miami-dade/article314607706.html; *see also* Raisa Habersham, *'Misuse of Authority': Little Haiti Cultural Center Director Challenges Suspension*, The Miami Herald, Feb. 3, 2026, https://www.miamiherald.com/news/local/community/miami-dade/article314548468.html.

**The Spotlight's Pre-Suit Efforts to Resolve the Constitutional Concerns**

86.     Plaintiff Miami News Trust—with the support of other concerned press organizations—sent a demand letter to Defendant City Manager on April 13, 2026, outlining the Gag Order's First Amendment problems. Exhibit J.

87. Plaintiff's demand letter requested a response within five (5) business days to discuss concerns regarding the Gag Order.

88. The City did not reply to the demand letter within the timeframe requested.

89. With litigation impending and having received no response to the demand letter after two full weeks, Plaintiff sent follow-up correspondence to Defendant City Manager on April 28, 2026, expressing Plaintiff's intent to maintain a professional working relationship through the resolution of this dispute and admonishing the City not to retaliate against the Spotlight or other press organizations. Exhibit K.

90. Nearly a month after Plaintiff's demand letter, the City replied that its policy "complies with United States Supreme Court precedent" because it "establishes who may provide a statement on behalf of the City. . . [without limiting] an individual's right to respond to the media as a private citizen on a matter of public concern." *See* Exhibit L.

91. However, the City's assertion conflicts with the text of the Gag Order, which facially requires even employees' comments as private citizens on matters of public concern to receive prior permission from the Office of Communications and City Manager.

92. The Gag Order provides that while "all employees have the right to their personal points of view regarding any issue," "City employees . . . shall not

16

initiate news media contacts . . . and the like without prior approval from the City Manager and in consultation with the Office of Communication[s]." § 01–11 at 2.

93.     Similarly, the Gag Order provides that although "all employees have the right to their personal points of view regarding any issue," when it comes to media-initiated inquiries, "where the media inquiries involve talk shows, radio, television, or web appearances; all responses shall receive advance approval from the City Manager, with the exception of designated spokespersons such as Director of Communications, Public Information Officers, Chief of Police and Chief of Fire." *Id.*

94.     The City's Gag Order facially applies to all press inquiries (besides those contained in the Emergency Services Exception) regardless of their substantive or qualitative aspects and interferes with employees' responses regardless of their nature.

95.     Because the City has not remedied any of the constitutional concerns raised in Plaintiff's correspondence, Plaintiff expects the significant impairments imposed by the Gag Order to continue without judicial enforcement of First Amendment rights.

96.     To redress the First Amendment injuries inflicted by the Gag Order, this suit follows.

## COUNT 1

### 42 U.S.C. § 1983 – VIOLATION OF THE FIRST AMENDMENT

97.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

98.     The First Amendment's Free Press Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, protects newsgathering by the press.

99.     The First Amendment protects both the press's and the public's "right to receive information." *Va. State Bd. of Pharmacy*, 425 U.S. at 757; *see also Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) (holding that the First Amendment protects newsgathering); *see also Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001) (holding that the inability to receive information from a willing speaker is an injury-in-fact).

100.    The First Amendment "assur[es] freedom of communication" between willing speakers and the press. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980).

101.    The City's Gag Order prevents the Spotlight and other press organizations from accessing information that they have a right to receive under the First Amendment, because it prohibits the City's employees from directly communicating with the press without Defendants' prior approval.

102.    But for the Gag Order, the Spotlight would have received newsworthy information from willing speakers employed by Defendant City of Miami—including

18

Barbara Prada and/or Quatisha Oguntoyinbo-Rashad—that it did not. *See* Exh. B; Exh. D; *see also* Exh. F.

103.    If the City chooses to respond to a media request, the Gag Order still imposes unwarranted delays on speech and newsgathering by routing communications through the Office of Communications and requiring pre-clearance from Defendant City Manager, both of which interfere with the receipt of information and publication of timely news. *See* Exh. E; Exh. G.

104.    Therefore, the Gag Order infringes on the protection provided to a willing speaker, their "communication … and [their] recipient." *Va. Citizens Consumer Council*, 425 U.S. at 756.

105.    Although Defendant City of Miami has greater authority to regulate speech to the press when acting as an employer, City employees still have First Amendment rights. *Pickering v. Bd. of Ed. of Twp. High Sch. Dist.*, 391 U.S. 563, 568 (1968).

106.    City employees have the right to speak as citizens on "matters of public concern." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995) ("*NTEU*").

107.    A City employee's speech is made as a citizen if it does not "owe[] its existence to . . . professional responsibilities," *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), meaning it is not "made *in accordance with or in furtherance of* the ordinary responsibilities of . . . employment," *Alves v. Bd. of Regents of Univ. Sys.*, 804 F.3d 1149, 1162 (11th Cir 2015) (emphasis added).

108.    The fact that a City employee " 'learn[s] of the subject matter of his [speech] in the course of his employment' [can]not alone transform his . . . 'speech as a citizen' into employee speech." *Id.* at 1161 (quoting *Lane v. Franks*, 573 U.S. 228 (2014)).

109.    Instead, " 'the First Amendment protects some expressions related to the speaker's job.' " *Id.* (quoting *Garcetti*, 547 U.S. at 421).

110.    In fact, "speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 240; *see also Pickering*, 391 U.S. at 572 ("Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent.").

111.    A City employee's speech is more likely to receive First Amendment protection as speech of a private citizen when it has a "relevant analogue" to speech that a citizen would ordinarily make. *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010).

112.    City employees are protected by the First Amendment when speaking "on a matter of public concern [rather than] on matters of only personal interest," meaning speech that "relate[s] to 'any matter of political, social, or other concern to the community.' " *Alves*, 804 F.3d at 1162 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

113. To justify restricting the protected speech of its employees, the City bears of the burden of proving that the Gag Order addresses "harms [that] are real, not merely conjunctional . . . in a direct and material way." *NTEU*, 513 U.S. at 475.

114. For the Gag Order to stand, the City also bears the heavy burden of proving that the "interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* at 468 (quoting *Pickering*, 391 U.S. at 571).

115. Aside from the Emergency Services Exception, the Gag Order also facially prohibits all responses by all City employees to media inquiries—without a distinction regarding comments made outside speech that "owes its existence to [their] professional responsibilities." *Garcetti*, 547 U.S. at 421.

116. Furthermore, the City cannot establish that the categorical nature of the Gag Order directly and materially addresses real harms.

117. The City also cannot prove that the Gag Order has a necessary impact on the actual operation of government, let alone an impact that outweighs the interests of all present and future speakers and the would-be recipients of the censored speech.

118. On at least one occasion, the City has applied its Gag Order to prevent the Spotlight from contacting a source, Ms. Quatisha Oguntoyinbo-Rashad, about expertise she developed in the course of her prior employment. *See* Exh. E.

119.    But because Ms. Oguntoyinbo-Rashad is no longer working in a role related to the topic of the interview, her speech in the requested interview would not be "made in accordance with or in furtherance of" her "ordinary responsibilities of . . . employment" and thus would be her fully protected speech as a citizen. *See id.*

120.    Even if Ms. Oguntoyinbo-Rashad were still working in the role, the First Amendment would protect her right to participate in a media interview  that is not in accordance with or in furtherance of her professional responsibilities, such as an interview about purely factual matters on related subject matter or on topics of interest to the community that she has learned through prior work or life experience.

121.    Ms. Oguntoyinbo-Rashad's interview would have had a "relevant analogue to citizen speech" because citizens often comment to media organizations regarding City initiatives, thus increasing the protection the speech warrants. *Weintraub*, 593 F.3d at 203.

122.    The Gag Order unconstitutionally restricts speech as applied to the Spotlight's inquiry to Ms. Oguntoyinbo-Rashad.

123.    Therefore, the Gag Order violates the freedom of speech protected by the Free Speech Clause of the First Amendment and the newsgathering process protected by the Free Press Clause of the First Amendment, both facially and as-applied to the Spotlight and its willing sources.

124.    The Gag Order operates as a prior restraint because it requires City employees to obtain approval from the Office of Communications and the City

22

Manager before responding to any press inquiry. *See Harman*, 140 F.3d at 115 (holding that a policy requiring government employees to obtain prior "permission from the agency's media relations department" imposed an unconstitutional prior restraint on employee speech); *see also Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209 (11th Cir. 2017) (holding that a government policy requiring members of the public to go through certain processes before speaking at school board meetings violated First Amendment as a prior restraint). Prior restraints "are inimical to the tenets of free expression underlying a free society." *Cooper v. Dillon*, 403 F.3d 1208, 1214–15 (11th Cir. 2005).

125.    Because the Gag Order "chills potential speech before it happens," it can be justified only by a showing that the "interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation'" of the City. *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571).

126.    Because no such showing is possible here, the Gag Order imposes a prior restraint that violates the First Amendment.

127.    Additionally, the Gag Order is unconstitutionally vague and overbroad because its wording "could [mean] just about anything," *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022), and it restricts more speech than is "necessary to accomplish its objective," *NTEU*, 513 U.S. at 462.

128.    In application, City employees have interpreted the Gag Order to mean different things. Depending on the employee, the Spotlight has been told that it must submit a public records request in order get information, others have directed the Spotlight to call a certain department or 311 to get information, and still others have provided information without prior City permission. *See* Exh. B; Exh. C; Exh. D.

129.    Because of the Gag Order's vagueness and overbreadth, it chills the speech of City employees who would otherwise seek to engage in conversation with members of the press. *See e.g.*, Exh. B; Exh. D; Exh. C.

130.    City employees must "curtail their expression if they wish to continue working for the Government," *NTEU*, 513 U.S. at 469, for fear of termination if they violate the Gag Order, even unintentionally—a fear that has materialized for at least one City employee and has been publicized in a way that could make other City employees aware, *see* Raisa Habersham, *Little Haiti Cultural Complex Loses Another Director. That Makes Four in Six Years*, The Miami Herald, Feb. 23, 2026, http://www.miamiherald.com/news/local/community/miami-dade/article314607706.html.

131.    Therefore, the Gag Order suppresses protected speech and chills the City's employees from speaking.

132.    In addition, the Gag Order is facially unconstitutional because it restricts speech only to members of the press, not to other organizations or private citizens, making it speaker-based discrimination subject to strict scrutiny.

133. When seeking information of public interest, "media representatives enjoy the same right of access as the public." *Richmond Newspapers*, 448 U.S. at 573.

134. Because speaker-based restrictions pose the risk that the government is attempting to control the content of speech, such restrictions are subject to strict scrutiny. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).

135. On its face, the Gag Order makes it more difficult, costly, and time-consuming for the press to receive information than it is for individuals or organizations seeking the same information if they are not members of the press.

136. As applied, the City has used the Gag Order in a discriminatory manner. As applied, private citizens can get information from City employees faster than members of the press when the same information is requested. *See* Exh. I.

137. By imposing special restrictions on employee speech only to the press, the Gag Order discriminates based on the identity of the speaker and the recipient of the speech.

138. Therefore, the Gag Order is a speaker-based restriction on speech because it treats speech differently depending on whether City employees are talking to the press.

139. The Gag Order is a content-based restriction on speech because it explicitly permits City employees to freely discuss some subjects with the press while prohibiting free speech about other topics. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

140.    Content-based restrictions on speech "are presumptively unconstitutional and may be justified only" if they pass strict scrutiny. *Id.*

141.    The Gag Order prevents City employees from communicating with the press about most subjects, but exempts communications regarding "incidents involving police, fire, or public safety emergency services." § 01-11 at 1.

142.    By allowing speech on certain topics while prohibiting speech on others, the Gag Order draws distinctions based on content.

143.    The City's stated purpose for the Gag Order—to respond to media requests "effectively, accurately and quickly"—is contradicted by the Gag Order's text and operation because it adds layers of approval and delays to the newsgathering process. *See* Exh. E; Exh. F; Exh. B; Exh. G.

144.    Additionally, the Gag Order violates the First Amendment because it provides unbridled discretion to the Office of Communications and the City Manager to control when City employees may speak to the press.

145.    Government policies that give "unbridled discretion" in enforcement raise constitutional concerns about viewpoint discrimination. *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

146.    The Gag Order provides no criteria for when the Office of Communications may approve, deny, or delay employee communications with the press, or when the City Manager may grant permission for a City employee to speak with the press.

26

147.    Without clear guidelines, the Gag Order improperly invites the City to allow favorable comments to the press while suppressing, delaying, or denying comments that the City disfavors, even as to employees' personal or unofficial opinions. *See Barrett*, 872 F.3d at 1221.

148.    The absence of clear guidelines gives the Office of Communications and City Manager excessive discretion to control what information reaches the press and the public.

149.    Because the Gag Order grants the Office of Communications and City Manager unbridled discretion over communications with the press, it creates a risk of unconstitutional viewpoint discrimination.

150.    Apart from the Emergency Services Exception, the Gag Order restricts *all* responses to media inquiries by *all* employees, regardless of subject matter, employee position, or factual circumstances.

151.    The City has no compelling interest that could justify the Gag Order.

152.    The City could adopt a narrower policy that restricts speech only when it is official comment on behalf of the City.

153.    Alternatively, this City could adopt a narrower policy that limits responses to press inquiries for people of certain tenure or rank, to ensure accuracy, while leaving open the ability to comment on matters of public concern for every employee.

154.    On information and belief, the City has not attempted a more narrowly tailored restriction on speech than the Gag Order.

155. The Gag Order is not the least restrictive means of advancing whatever legitimate or important interests the City may possess.

156. The Gag Order restricting speech, both facially and as applied, violates the First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

157. The Defendants, by implementing and enforcing the Gag Order, have violated, and continue to violate, the First Amendment by depriving the Spotlight of its right to receive information from City employees who are willing to speak.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests relief and judgment, as follows:

A. Declare that the City of Miami's Gag Order facially violates the First Amendment to the United States Constitution;

B. Declare that the City of Miami's Gag Order violates the First Amendment to the United States Constitution as applied to the Spotlight;

C. Enter an order enjoining Defendants City of Miami and City Manager James Reyes, and all other Miami officers, agents, servants, employees, contractors, attorneys, and other similar persons in active concert or participation with Defendants who received actual notice of the injunction, from enforcing the Gag Order;

D. Grant an award of nominal damages against Defendants City of Miami and City Manager Reyes, in his official capacity, to Plaintiff in an amount this Court deems appropriate;

E.  Grant an award to Plaintiff of reasonable costs and expenses of this action, including attorneys' fees pursuant to 42 U.S.C. § 1988;

F.  Should it be needed, a trial on all issues of fact stated herein; and

G.  Award such further relief as this Court deems just and proper.


Dated: June 5, 2026                          Respectfully submitted,

                                             */s/ Denise M. Harle*

                                             **DENISE M. HARLE**
                                             Florida Bar No. 81977
                                             **FLORIDA STATE UNIVERSITY**
                                             **COLLEGE OF LAW**
                                             **FIRST AMENDMENT CLINIC**
                                             425 West Jefferson Street
                                             Tallahassee, FL 32306
                                             (850) 644-3255
                                             DHarle@law.fsu.edu

                                             **SHEENA M. KELLY**
                                             Florida Bar No. 1028128
                                             **FLORIDA STATE UNIVERSITY**
                                             **COLLEGE OF LAW**
                                             **FIRST AMENDMENT CLINIC**
                                             425 West Jefferson Street
                                             Tallahassee, FL 32306
                                             (850) 644-3255
                                             SKelly@law.fsu.edu

                                             *Counsel for Plaintiff*
                                             Miami News Trust, Inc.

29

## VERIFICATION

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, ___David Villano___, being duly sworn, affirm that I am the President of Miami News Trust, Inc. in the above captioned action and have authorized the filing of this complaint. I have reviewed the allegations made in the complaint, and to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on communications from the City of Miami and City of Miami employees and my history of interacting with the City of Miami, and I believe them to be true.


David Villano, President
Miami News Trust, Inc.

Sworn to me this 3RD day of June, 20 26

Notary Public

Notary Public State of Florida
Stanley Moore
My Commission HH 585236
Expires 9/28/2028