# EXHIBIT J

EXHIBIT J



April 13, 2026

James Reyes, City Manager
Office of the City Manager - City of Miami
Miami Riverside Center (MRC)
444 SW 2nd Ave #10
Miami, FL, 33130
305-250-5400

**Re:    APM 01-11: Media Relations Policy**

Dear Mr. Reyes,

We represent Coconut Grove Spotlight ("the Spotlight"), a publication of the Miami News Trust, regarding the City of Miami's Media Relations Policy ("Media Policy"). Other members of the press—the Miami Herald, The Miami Times, and WLRN ("Concerned Partners")—share similar concerns and have an interest in a prompt and amicable pre-suit resolution. The Media Policy restricts City employees from talking to the press because "[t]he Office of Communications will serve as the sole liaison with the media." MIAMI, FL., Administrative Policies § 01-11 (Revised March 2018) at *1. The Media Policy applies to comments by "all [C]ity employees" relating to all "media inquiries they receive." *Id.* Press reports at the time suggest that the Media Policy was originally enacted more than a decade ago in response to a public dispute between City employees. *See* Todd Wright, *Moment of Silence: Miami Employees Banned from Talking to Media*, MIAMI HERALD, Jan. 12, 2011. Consequently, the subset of City employees allowed to talk to the press "has shrunk from pretty much every employee with an opinion to just [the City Manager] and his staff." *Id.*

The Media Policy states that its purpose is to respond to press "inquiries effectively, accurately, and quickly." § 01-11 at *1. Yet the stated purpose extends far beyond the original motivation. Currently, the Media Policy censors every City of Miami employee who wishes to speak to the press. Such restrictions have led to consequences that, although potentially well-intended, contradict the Media Policy's stated objective. The results are significant barriers for press organizations to receive information and for City employees to speak freely. This imposes hardships specifically on covering Miami-related news. And it hinders the ability of the press



to provide news that faithfully reflects the full diversity and interests of the community.

Due to their history covering news in the area, the Spotlight and its Concerned Partners often know sources from which to obtain information—sometimes relying on prior relationships. In these instances, the press is well-positioned to conduct newsgathering by directly reaching out to sources, allowing for timely publication. But the Media Policy requires communication through a central office, limiting the press's access. Consequently, press emails are seemingly ignored, declined, or redirected—sometimes to the wrong person—in explicit service of the Media Policy. Even when City of Miami employees have wanted to speak, they have repeatedly denied comment or information, citing the Media Policy. This is contrary to the public interest in the free flow of information from government institutions and creates significant barriers to publishing relevant and timely news. In the best-case scenario, the Media Policy causes a substantial delay in receiving information, prohibiting timely publication. In the worst-case scenario, the Media Policy prohibits publication altogether.

Press access to information and timely publication have "preserved the nation's security for almost 250 years. [They] must not be abandoned now." *New York Times Co., v. Dep't of Defense*, No. CV 25-04218, 2026 WL 788689, at *1 (D.D.C. Mar. 20, 2026). In March 2026, a federal judge in Washington DC overturned a White House mandate denying Pentagon access to reporters unless they agree to only solicit information approved by the president. *Id.* at *5. At its core, this case emphasized that the "freedom to ask questions of public officials is fundamental to the work of journalism." *Id.* at *10.

In Florida, on October 8, 2025, the Village of Key Biscayne rescinded its media relations policy in response to a lawsuit brought by a press organization. John Pacenti, *Key Biscayne's Manager Tried to Rebrand Gag Policy to Village Council When Faced with First Amendment Lawsuit*, KEY BISCAYNE INDEPENDENT (Mar. 27, 2026), https://kbindependent.org/2026/03/27/key-biscaynes-manager-tried-to-rebrand-gag-policy-to-village-council-when-faced-with-first-amendment-lawsuit/. That case addressed concerns that—also true here—the press could not question public employees and that public employees did not have the right to speak freely on matters of public concern. *Id.* In the settlement agreement, Key Biscayne agreed to pay $25,000 and committed to broader public transparency should a different media relations policy ever be proposed. *Id.*

Here, the Media Policy limits the press's ability to gather and publish news, and restricts City of Miami employees' communications, raising significant First Amendment concerns. As explained below, the Media Policy infringes both the right



to free press and the right to free speech. The Media Policy operates as a prior restraint on the press, suppresses the newsgathering process, and delays subsequent publication. It also suppresses employee speech, preventing employees from acting as involved citizens on matters of public concern, and inviting viewpoint discrimination. We conclude by providing next steps to bring the Media Policy into constitutional compliance.

In short, the Spotlight respectfully urges the City of Miami to immediately revise or rescind its Media Policy. Additionally, the Spotlight seeks a meeting with the City of Miami  to engage in collaborative policy revisions or clarifications to ensure that the City's Media Policy respects First Amendment rights.

## I.   FREE PRESS ANALYSIS

### A.   The Media Policy imposes a prior restraint on press organizations' ability to gather news, violating the First Amendment right to freedom of the press.

A prior restraint is government action that "forbids certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (internal quotations omitted). In short, they are gag orders. The Media Policy regulates all media comments made by City employees prior to requests being made. Therefore, the Media Policy is a prior restraint. *Harman v. City of New York*, 140 F.3d 111, 115 (2d Cir. 1988) (finding a policy which "forbid[s] employees from speaking with the press regarding any policies or activities of the agency without first obtaining permission from the agency's media relations department" to be a prior restraint); *see also CBS Inc. v. Young*, 522 F.2d 234 (6th Cir. 1975) (holding that a judicial gag order was a prior restraint).

Prior restraints are strongly disfavored, and the U.S. Supreme Court has called them "the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Prior restraints overregulate speech, thereby both restricting and chilling speech that is protected by the First Amendment. These effects are particularly damaging when the restraint "falls upon the communication of news and commentary on current events." *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971). To protect the fundamental right of expression from this threat, the Court has set a high bar for justifying prior restraints, requiring the government to "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995) ("*NTEU*"). Under this demanding standard, no government "has ever prevailed—from the 1940s to the present day—when a policy forbidding unauthorized

3



interviews was challenged." Frank LoMonte, *Government Agencies Can't Stop Employees from Talking to the Press. Here's Why*, POYNTER, Oct. 15, 2019, at 4.

A prior restraint will stand only if the government entity can show that the need for the regulation to facilitate " 'actual operation of the government' " outweighs "a broad range of both future and present expression." *NTEU*, 513 U.S. at 468 (quoting *Pickering v. Bd. of Ed.*, 391 U.S. 563, 571 (1968)). This standard operates with a "general presumption against prior restraints." *Harman*, 140 F.3d at 119.

Here, the purported purpose of the Media Policy is to respond to press "inquiries effectively, accurately, and quickly." § 01-11 at *1. This justification is problematic for several reasons. First, there is no alleged connection between the stated purpose and how or why the restrictions in the Media Policy are necessary to facilitate the operation of the government. Second, the Media Policy requires *additional* government action for every media request, making government operations more cumbersome than necessary. Finally, even if it relates to the actual operation of government, the Media Policy does not outweigh the expression of every current and future member of the press who contacts a City of Miami employee to bring valuable news to the public and every employee who would so respond.

The Media Policy prohibits speech directed to the press and thus restricts the expression contained in current and future publications. This prohibition occurs before any statement is ever made, making it a prior restraint on both gathering news and communicating it to the public, infringing the Spotlight's—and other press organizations'—First Amendment rights.

B. **The Media Policy infringes on press organizations' First Amendment rights to pursue matters of public concern by talking to willing public employees.**

The Media Policy also prohibits press organizations from exercising their right to receive information from willing speakers. When there is a willing speaker, the United States Constitution provides protection "to the communication, to its source and to its recipient." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). Together, these rights establish a "nexus between openness, fairness, and the perception of fairness" in government. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980). In this way, the First Amendment, "assur[es] freedom of communication." *Id.* at 570, which is the right that the Spotlight invokes here.

City employees are less likely to speak to the press because they are restrained by the Media Policy. By establishing the "Office of Communications... as

4



the sole liaison with the media," § 01-11 at *1, the Media Policy requires city employees to ask permission to speak "'from the very people whose judgments [employees may] call into question,'" Frank D. LoMonte, *Protecting Sources and Whistleblowers: The First Amendment and Public Employees' Right to Speak to the Media*, A BRECHNER CENTER ISSUE BRIEF, 5 (Oct. 7, 2019), https://brechner.org/wp-content/uploads/2019/10/Public-employee-gag-orders-Brechner-issue-brief-as-published-10-7-19.pdf (*referencing Harman,* 140 F. 3d at 119-20). As a result, city employees that might otherwise talk to the press are less likely to do so.

This results in a deprivation of newsgathering rights and causes damage to institutional credibility of press outlets. The press loses access to information that would ordinarily be provided by the City employees who have it. Ultimately, when conversations are barred by the Media Policy, "the quality of news stories suffers... undercut[ting] the trustworthiness of news coverage." LoMonte, *Protecting Sources and Whistleblowers* at 3. Without protection for the legitimacy of the newsgathering process, "freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). This hurts the press and the City of Miami's institutions alike, as well as the citizens of the City of Miami.

When the press's newsgathering rights are restricted, courts apply strict scrutiny analysis to protect those rights. Strict scrutiny requires the regulation be justified " 'by a compelling governmental interest, [and be] narrowly tailored to serve that interest.' " *Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 928–29 (5th Cir. 1996) (quoting *Globe Newspaper v. Superior Court*, 457 U.S. 596, 607 (1982)) (holding that an order prohibiting comments concerning drafts of desegregation plans was an unconstitutional prior restraint because it intruded on news agencies' right to gather news and receive speech).

Under strict scrutiny, responding to press "inquiries effectively, accurately, and quickly," § 01-11 at *1, does not constitute a compelling government interest. When determining whether a regulation withstands strict scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted). Here, the Media Policy prohibits much more speech than necessary to accomplish the asserted interest. City employees could respond to press requests quickly and accurately without the Media Policy's categorical bar. The stated government interest fails common sense, defies logic, and does not consider the actual burden on First Amendment rights created in service of the stated objective. In short, the stated government interest is not sufficiently compelling.

In addition, the Media Policy is not narrowly tailored to achieve the stated purpose because it limits the expression of "all city employees" relating to all "media inquiries they receive." § 01-11 at *1. A more targeted instrument is required to regulate speech. Not only is the Media Policy not narrowly tailored for its purported



purpose, but it does not serve that purpose at all. Common sense tells us that adding an additional step into a process slows the process down. The same is true here. The press often knows exactly who they would like to speak to and who they have spoken to previously about similar topics. Therefore, the press can get accurate and relevant information more quickly if they do not have to communicate with a central office.

There have been several specific instances of City employees citing the Media Policy in their refusal to speak to the Spotlight. At least one City employee has retracted a statement previously given to a press organization, citing the Media Policy as the reason. This prevented the press from publishing information that would have otherwise been available. Another exchange between several City employees directed the press to multiple different locations to receive permission for a city comment. These examples illustrate how the Media Policy does not work to respond to media inquiries effectively or quickly. Finally, another City employee was purportedly terminated from her position for violating the Media Policy. *See* Raisa Habersham, *Little Haiti Cultural Complex Loses Another Director. That Makes Four in Six Years*, Miami Herald (Feb. 9, 2026), https://www.miamiherald.com/news/local/community/miami-dade/article314607706.html; *see also* Joshua Ceballos, *Leaders Allege 'Systemic Issues' at Little Haiti Complex as Manager is Fired*, WLRN (Feb. 9, 2026), https://www.wlrn.org/arts-culture/2026-02-09/little-haiti-cultural-complex-miami-fired.

Because the Media Policy is not narrowly tailored to advance—and does not actually advance—a compelling governmental interest, it likely fails strict scrutiny as an unconstitutional restriction on the right of press organizations to receive information from willing speakers.

C. **The Media Policy infringes on press organizations' First Amendment rights to timely publish news on matters of public concern.**

Just as the press has the right to gather information, the press has the right to publish news. There are "special protection[s] against orders that prohibit the publication or broadcast of particular information." *Neb. Press Ass'n*, 427 U.S. at 556. Such protections are not limited to orders that prohibit publication altogether. Instead, "[w]here the right to speak about contemporary issues of the day is at stake, delay is itself an injury." Frank D. LoMonte, *Putting the 'Public' Back into Public Employment: A Roadmap for Challenging Prior Restraints That Prohibit Government Employees from Speaking to the News Media*, 68 Kan. L. Rev. 1, 64 (2019).

The Media Policy chills speech that would otherwise be available to the press. It interferes with newsgathering and, consequently, prevents or delays the press



from publishing news it otherwise would be able to. Even when the press is able to obtain sufficient information to publish the news, it takes longer. But when the "preservation of our American democracy depends upon the public's receiving information speedily," delays in publication are unacceptable. *Firstamerica Dev. Corp. v. Daytona Beach News-J. Corp.*, 196 So. 2d 97, 98 (Fla. 1966). The additional time to receive information from an overburdened central office delays publication, creating another distinct injury to the press. But the law's "special protections" exist to protect against such injuries and ensure the press's ability to publish news. *Neb. Press Ass'n,* 427 U.S. at 556.

Strict scrutiny applies to restrictions on news publication. *Davis*, 78 F.3d at 928–29. Again, the Media Policy fails strict scrutiny and prevents press organizations from publishing news in a timely fashion or at all.

D. **The Media Policy raises speaker-based discrimination concerns because it places greater barriers on the press than on the public in seeking information.**

When seeking information of public interest, "media representatives enjoy the same right of access as the public." *Richmond Newspapers*, 448 U.S. at 573. Yet the Media Policy regulates City employees' speech only when it is directed to press organizations. The Media Policy expressly states that it governs "communication with or information provided *to all media* in any form." § 01-11 at *1 (emphasis added). It does not reference city employees providing information to concerned citizens or organizations not associated with the press. Accordingly, the Media Policy makes it more difficult and time-consuming for the press to access information than it is for average citizens or members of non-press organizations.

When speech regulations discriminate against the press by providing other groups easier access to information, there are "serious First Amendment concerns" if the differential treatment cannot be "justified by some special characteristic" of the circumstances. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 659–61 (1994). Because press organizations are a " 'vital source of public information,' " there are no special characteristics of the press that warrant this regulation. *Zerilli v. Smith*, 656 F.2d 705, 710 (D.C. Cir. 1981) (quoting *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936)). Worse yet, this restriction undercuts special characteristics about the press—most notably its purpose to provide timely information to the public—that necessitate access to information. This discrimination improperly prohibits access to information necessary to publish news and "allow[s] speech by some but not others." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).

7



The First Amendment strongly disfavors speaker-based discrimination due to its potential as "a means to control content." *Id.* Consequently, such speech regulations must survive strict scrutiny analysis. *Id.* But the Media Policy cannot survive such scrutiny. This creates a fourth, independent concern regarding the Media Policy: The Media Policy exhibits speaker-based discrimination against press organizations by creating additional barriers to information applicable only to the press.

**\* \* \***

In sum, the Media Policy restricts the Spotlight's—and other press organizations'—First Amendment rights. Before a media request is even made, the Media Policy prevents the press from serving its function. The infringement continues all the way through the newsgathering and publication processes, suppressing First Amendment freedom of the press at every turn.

## II.   FREE SPEECH ANALYSIS

### A. The Media Policy is a content-based restriction on speech.

A restriction is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In *Reed*, the Supreme Court unanimously struck down an ordinance that treated signs differently based on the content displayed. Because the ordinance prohibited certain messages while permitting others—depending on the content—it violated the First Amendment.

Similarly, the Media Policy exempts certain types of speech while restricting others. The Media Policy forces City employees to route most types of communications with the press through the Office of Communications, but exempts "incidents involving police, fire, or public safety emergency services." *See* § 01-11 at *1. By allowing certain categories of speech while restricting others, the Media Policy draws distinctions based on subject matter. Therefore, it is a content-based restriction on speech.

Content-based restrictions on speech "are presumptively unconstitutional and may be justified only" if they pass strict scrutiny. *Reed*, 576 U.S. at 163. Laws subject to strict scrutiny seldom, if ever, survive in "the First Amendment context, [as shown by the fact that] we have held only once that a law triggered but satisfied strict scrutiny." *Free Speech Coal. v. Paxton*, 606 U.S. 461, 484 (2025). Because it is a content-based restriction, in addition to the reasons described above, the Media Policy fails strict scrutiny and is unconstitutional.



## B. The Media Policy encourages viewpoint discrimination.

The Media Policy permits viewpoint discrimination because it gives "unbridled discretion" to the Office of Communications to filter media requests. *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (holding that a regulatory scheme that affords government officials complete discretion to selectively enforce the rule presents constitutional problems); *see also* § 01-11 at *1. Viewpoint discrimination exists when the government restricts "particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), which the current Media Policy would permit. Such restrictions "based on viewpoint are prohibited, seemingly as a per se matter." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022). The Media Policy does not provide criteria for approving media requests. Therefore, it invites the Office of Communications to allow media requests that are favorable to the City while denying—or substantially delaying—those that are not.

Viewpoint discrimination is an "egregious form" of First Amendment violation. *Rosenberger*, 515 U.S. at 829. The Supreme Court has repeatedly evaluated viewpoint discrimination under strict scrutiny, striking down a wide range of discriminatory speech regulations. *See, e.g.*, *Iancu v. Brunetti*, 588 U.S. 388 (2019) ("First, if a trademark registration bar is viewpoint-based, it is unconstitutional."); *Matal v. Tam*, 528 U.S. 218 (2017) (striking down a ban on "disparaging" trademarks); *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1282 (11th Cir. 2024) ("This law, as Florida concedes, draws its distinctions based on viewpoint—the most pernicious of dividing lines under the First Amendment."); *Speech First,* 32 F.4th 1110 (restrictions "based on viewpoint are prohibited, seemingly as a per se matter."). Because it creates unbridled discretion capable of favoring viewpoints that the City of Miami prefers, while silencing others, the Media Policy may have the effect of promoting unconstitutional viewpoint-based discrimination.

Providing broad, unqualified discretion to government officials is a common form of viewpoint discrimination. In *Lakewood v. Plain Dealer Publishing Co.,* the U.S. Supreme Court held that a licensing statute vesting "unbridled discretion" in a government official is unconstitutional because it intimidates parties into censoring their own speech and allows the official to discriminate against disfavored viewpoints. 486 U.S. 750, 760 (1988) ("the Constitution requires that the city establish neutral criteria to ensure that the licensing decision is not based on the content or viewpoint of the speech being considered.").

Likewise, although it expressly designates the Office of Communications to select a spokesperson to respond to the press on behalf of the contacted party, the Media Policy contains no neutral criteria mitigating the total discretion of the Office of Communications in deciding when and whether to respond to media requests. This lack of clarity effectively vests the Office of Communications with unlimited



leeway to accommodate—or ignore—requests, allowing the City to broadcast the viewpoints of others when it agrees while suppressing those that are less favorable. This can result in blatant viewpoint discrimination. The Constitution does not necessarily require removal of all discretion from the Media Policy. But the existence of at least some neutral criteria is essential to avoid vesting the Office of Communications with "unbridled discretion," as the current Policy does.

**C. The Media Policy raises concerns about whether it improperly restricts government-employee speech.**

Although it is true that the government, when it acts as employer rather than a sovereign, has greater authority to restrict speech, that authority is tightly circumscribed by precedent set forth in *Pickering v. Board of Education,* 391 U.S. 563 (1968). In *Pickering*, a teacher was fired for a letter he wrote to a newspaper complaining about the policies of his employer, a public school. In deciding whether the government could permissibly regulate his speech, the U.S. Supreme Court formulated a balancing test, weighing the teacher's interest in speaking as a citizen on a matter of public concern against the interest of the government in promoting the efficiency of its operations. The Court held that government employees do not abandon their constitutional rights upon accepting employment.

The Supreme Court later reaffirmed this principle, relying on the test it formulated in *Pickering,* when it struck down a law prohibiting all government employees from accepting honoraria, even if their speech had nothing to do with their official duties. *NTEU*, 513 U.S. 454. Using the *Pickering* test, the Court held the law unconstitutional on two grounds: failure to demonstrate actual harm, and lack of narrow tailoring. The Media Policy possesses the same flaws.

First, as the Court held in *NTEU,* government entities enacting policies that burden speech must be acting to remedy actual, rather than hypothetical, harm to justify the burden. As in *NTEU*, our client does not know of any evidence indicating the Media Policy is being used to remedy anything other than hypothetical harms. Federal courts find such broad restrictions improper to address harms that are purely speculative. *See, e.g., Harman*, 140 F.3d at 123 ("The interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship.").

Second, like the statutory language struck down by the Supreme Court in *NTEU*, a regulation that is underinclusive or overinclusive poses twin dangers of (1) restricting constitutionally protected speech and (2) uneven application. A statute is overinclusive when its scope covers speech that is constitutionally protected in addition to speech that it is within the government's purview to regulate, as the law in *NTEU* covering speech completely unrelated to the employees' work. A statute is underinclusive when it fails to regulate some conduct that poses the same threat

10



the government is trying to address, like the law in *NTEU* banning employees being paid for speech but not with other activities like travel and meals.

The same defects with the law in *NTEU* exist here. The prohibition in the Media Policy could encompass employee speech to the press that has nothing to do with their employment. *All* contact with the press by employees during working hours must go through the Office of Communications for the Office to coordinate a response with the City Manager's Office. § 01-11 at *1. And no media contact of any kind may be initiated by employees without prior approval from the City Manager. *Id.* This sweeping rule is both overinclusive because it covers all employee concerns, work related or not, and underinclusive because it does not prevent employees from speaking to the press outside of work hours.

### D. Federal courts have held similar policies unconstitutional because they restrict speech and discourage people from speaking.

Federal courts, including the Eleventh Circuit, have found policies similar to the Media Policy unconstitutional for their content-based nature and tendency to chill speech. Examples include:

- *Cooper v. Dillon*, 403 F.3d 1208 (11th Cir. 2005): The court struck down a Florida statute that criminalized the disclosure of non-public information from internal police investigations, holding that it was an unconstitutional content-based restriction that failed strict scrutiny.

- *Harman v. City of New York*, 140 F.3d 111 (2d Cir. 1998): Applying the *NTEU* standard, the court invalidated a city policy requiring employees to obtain prior approval before speaking to the media, ruling it an overbroad prior restraint that "chilled" speech on matters of public concern.

- *Barrett v. Thomas*, 649 F.2d 1193 (5th Cir. 1981): A Dallas County Sheriff's Deputy was disciplined for making "unauthorized" public statements to the media. The department rule forbade any public statements on "controversial" department matters without the Sheriff's permission. The court found the rule operated as a permanent "gag" on employees. Because it applied to all employees and all topics deemed "controversial" by the Sheriff, it exerted a "massive chilling effect" on speech that was clearly in opposition to the public interest.

- *Wernsing v. Thomspon*, 423 F.3d 732 (7th Cir. 2005): The court held unconstitutional, as a prior restraint, an Illinois Department of Human Services policy prohibiting employees from speaking to "any external agent" (including the media) regarding any agency matter without prior approval from the Chief of Public Information. The court found that the policy was "overbroad" (applying *NTEU*) and improperly gave the government unbridled discretion.

11

**FSU | FIRST AMENDMENT CLINIC**

- *Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016): Two police officers were disciplined after posting comments on Facebook criticizing a department promotion. The department's "Social Networking Policy" prohibited any posts that would "tend to compromise or damage the mission, function, reputation or professionalism" of the department. The court ruled that the policy was a "sweeping" restriction that effectively banned all speech that was not "positive" about the department. Such a restriction "chilled" speech on matters of public concern (like department corruption or inefficiency) and failed the *Pickering/NTEU* balancing test. Therefore, the policy was held unconstitutional.

- *Moonin v Tice*, 868 F.3d (9th Cir. 2017): The court held that a highway-patrol policy prohibiting officers from discussing a specific interdiction program with any "non-departmental" person was an unconstitutional prior restraint that failed the *Pickering/NTEU* balancing test.

- *Decker Advert. Inc. v. Delaware Cnty.*, New York, 765 F. Supp. 3d 128, 153 (N.D.N.Y. 2025): In a First Amendment challenge to a county's media-access ban, a federal district court ruled that the complaint sufficiently alleged that the directive violated the First Amendment as an impermissible prior restraint, allowing the press outlet to move forward with its claims.

- *New York Times Co., v. Dep't of Defense*, No. CV 25-04218, 2026 WL 788689 (D.D.C. Mar. 20, 2026): Last month, a federal district court struck down the Pentagon's media access policy, ruling that it violated the First Amendment by imposing "unreasonable" restrictions and viewpoint-based discrimination. The court explained that while the government does not have to give unlimited access to the press, it cannot make decisions that are arbitrary, unfair, or based on viewpoint. The ruling reinforces a key principle: a free press requires fair and equal access to information.

- *Miami Fourth Estate, Inc. v. Village of Key Biscayne*, 1:25-cv-22838-JEM (S.D. Fla. Filed Jun 24, 2025) (case was subsequently settled for $25,000 and the policy in question was rescinded): The Village of Key Biscayne recently agreed to pay a media organization $25,000 and rescind its media policy that prevented local government employees from talking to the media without approval. In addition, the Village agreed to additional public transparency should a different media policy ever be proposed.

\* \* \*

In sum, the Media Policy is a content-based restriction that raises serious constitutional concerns. Particularly worrisome is its inherent discretion that could invite viewpoint-based discrimination and restrict government-employee speech.

12



## CONCLUSION

The Media Policy poses several constitutional problems that should be addressed. Much like the recent case in Key Biscayne, the Media Policy improperly prevents the press from accessing and publishing information while also improperly censoring the voices of City of Miami employees, even in their private capacity and on matters of public concern.

Our client, the Coconut Grove Spotlight, respectfully urges the City of Miami to revise the Media Policy, so it complies with the First Amendment. The Concerned Partners share these concerns too and are interested in a prompt, pre-suit resolution. Our client formally requests a meeting with you to discuss the concerns raised and would be happy to collaborate with the City of Miami to draft a new policy that respects First Amendment rights while advancing the City's interests. Please respond to this letter within five (5) business days to set a time to meet and address these concerns.

You can reach us via the contact information listed below.


Sincerely,


_____

Denise M. Harle
*Director*, FSU College of Law First Amendment Clinic
dharle@law.fsu.edu

CC:
George Wysong, City Attorney
law@Miamigov.com
Sheena Kelly, Supervising Staff Attorney, FSU First Amendment Clinic
skelly@law.fsu.edu
David Villano and Don Finefrock, Co-editors, *Coconut Grove Spotlight*
Editor@coconutgrovespotlight.com
Mel Meinhardt, publisher, *Coconut Grove Spotlight*
Publisher@coconutgrovespotlight.com
Dana Banker, Senior Managing Editor, *Miami Herald*
Dbanker@miamiherald.com
Sergio Bustos, Vice President for News, *WLRN*
Sbustos@wlrnnews.org



Garth Reeves, Publisher, *Miami Times*
Garth@miamitimesonline.com